[Civ. No. 1076.   Third Appellate District.—March 25, 1913.]

## ANNIE E. MADDEN, Respondent, v. G. W. HALL, Appellant.

ADVERSE POSSESSION—PERMISSIVE USE BY OCCUPANT.—Where the owner of land puts it in charge of other persons and gives them a right to use it, their possession is regarded as permissive and cannot ripen into title by prescription, unless they repudiate the relation existing between them and the owner and assert title in hostility to him.

ID.—INTENTION OF OCCUPANT—NECESSITY OF ACTS OF DOMINION.—
Mere intention to occupy land, however openly proclaimed, is not
such possession as will ripen into title by prescription; the intention
must be carried into actual execution by unequivocal and notorious
acts of dominion, which indicate to the public that the occupant
has appropriated the land and claims exclusive dominion over it.

ID.—HUSBAND AND WIFE—ADVERSE HOLDING BETWEEN.—As between
husband and wife, adverse possession cannot exist; the marital rela-
tion must be terminated, either by divorce or abandonment, in order
that one may acquire title from the other by prescription.

ID.—MARRIED WOMAN—ACQUISITION OF PROPERTY BY PRESCRIPTION.—
A married woman, not living separate and apart from her husband,
and having no claim in her own right to land, cannot acquire title
to it as her separate estate by adverse possession.

APPEAL from a judgment of the Superior Court of Modoc
County. Clarence A. Raker, Judge.

The facts are stated in the opinion of the court.

J. M. Cross, Maddux & Maddux, and F. O. Hoover, for
Appellant.

F. M. Jamison, for Respondent.

CHIPMAN, P. J.—Action to quiet title claimed to have
ripened by adverse possession. Plaintiff had judgment from
which defendant appeals under the alternative method. The
land involved is an eighty-acre tract, to wit: The S. W. ¼
of the S. E. ¼ of sec. 24 and the N. W. ¼ of the N. E.
¼ of sec. 25, T. 43 N., R. 12 E., M. D. M., situated in Modoc
County.

The court made the following findings:

III. That on February 11, 1893, a patent was issued by
the United States to defendant and on that date defendant
was the legal owner of the land involved and on that date
and prior thereto "the said land and the whole thereof was
unfenced, uninclosed and uncultivated wild land."

IV. That said land "continued to be unfenced, uninclosed
and uncultivated wild land until the spring of 1904" at which
time plaintiff, "claiming to be the owner, entered into the
actual possession of same" and, during the spring of 1904,
plaintiff "inclosed said real estate and the whole thereof with

a substantial inclosure" describing the same, except a few hundred feet on the east side, where a natural rock barrier constituted the fence, and said inclosure was maintained continuously to the comencement of this action. Then follow findings that, during all this period from 1904 to the commencement of the action, to wit, from the spring of 1904 to September 9, 1910, plaintiff's possession has been open, continuous, exclusive, and notorious and hostile to the whole world under claim of title and plaintiff has paid all taxes levied and assessed upon the property during said period.

The conclusion of law is that plaintiff is the owner of said land and defendant has no right, title, or interest therein.

It appears that, for some years prior to February 11, 1893, defendant had possession of the land in question under the Desert Land Act and, on the day named, a patent issued to him. Plaintiff and her husband were neighbors of defendant also living on a farm two or three miles distant from said land. In 1892 defendant left Modoc County and moved to San Joaquin County and did not return to Modoc County until 1910 except on one occasion not long after he first left when he remained but a short time. He testified that when he left Modoc County he left the land "in charge of Mr. Madden—John Madden" (plaintiff's husband). He was asked to state the circumstances under which he placed Mr. Madden in charge. "Well, we was, you might say, good friends, or" (the witness was interrupted by an objection from plaintiff's counsel which was overruled). "Well, the reason I left it was because I had nobody else to leave it with, and I wanted to leave it with a responsible man, and thought he was. Q. What arrangements did you make with Mr. Madden at that time, if any? A. He was to have the use of the land; he was to go in there and get wood and posts; he was to get wood and posts for looking after the land." Part of the land was rock and trees grew on it. He testified that Madden was to look after the land, "see that the taxes were paid and let me know. He was to write to me and I was to send him the money to pay up the taxes whenever they came due." The witness produced a receipt, signed by John Madden, as follows:

"ALTURAS, CAL., Dec. 8th, 1893.
"Received from Geo. W. Hall sixty-two & 5/100 dollars.
Credited on note..................................$54.10
Taxes 1892, 5.25; taxes 1893, 2.70..................  7.95

                                                   $62.05
"$62.05                        JOHN MADDEN."

He testified that the $54.10 was a credit on a note held by one Stewart; that he owed Madden nothing then or at any time. Plaintiff, as a witness, testified that she understood that her husband had a note and mortgage of Madden's, in 1893 or 1894, but no such indebtedness was shown and Hall testified that the only mortgage he had made was one to Stewart and did not embrace the land in question. There is no denial of the facts stated by Hall as to Madden's agency or other of the above facts testified to by him. Hall's absence from Modoc County during the succeeding years is not explained and no communication with the Maddens is shown after December, 1893.

In 1902 an action was brought against Madden and judgment obtained December 1, 1902, which was levied on certain property and, for some unexplained reason, including the land in question. At the sale plaintiff became the purchaser of all the property levied upon for six hundred dollars, and on January 24, 1903, a sheriff's certificate of sale was issued to her. On June 29, 1903, the court made an order, on her motion, in the action, canceling the certificate of sale issued to plaintiff and ordering the sheriff to return to her the six hundred dollars, which was done and, of course, this certificate ceased to confer any, even color of title, or right in plaintiff. She claims to have initiated her adverse possession in 1903 by virtue of this execution sale in the action against Madden. She filed an affidavit in that action, dated February 6, 1903, as the wife of John Madden, defendant in the action, and representing that she was authorized to appear for him as his attorney in fact and protect his interests at said sale and requested the land to be sold in one body. She took no steps toward taking possession of the land or fencing, cultivating or making improvements or otherwise showing adverse possession until in the spring of 1904 and what was done was done exclusively by one James Campbell. She testified:

"I had Mr. Campbell fence it, I think in the year 1904. . . . I told him if he would fence that eighty acres I would give him the benefit he derived from it. . . . He cleared a number of acres and put in grain and some alfalfa. I think it has been cultivated since 1904 or 1905. I don't know just exactly. Q. I will ask you to state now whether or not you have claimed that land ever since 1903? A. I have. Q. State whether you have claimed it openly? A. I have claimed it openly if the occasion called for it. Q. You made no concealment of it? A. No, sir. I spoke of it generally as my land. Q. Has anybody else during that time ever claimed it? A. Not to my knowledge." She testified to having paid the taxes and it sufficiently appeared that she did pay all the taxes levied and assessed on the land after 1903 and up to and including the year 1909. The foregoing is the substance of her testimony.

James Campbell testified that he fenced the land in question for plaintiff in 1904—"fenced it for the use of it." His description of the fence shows that it was sufficient compliance with the law so far as the character of the structure itself is concerned. The work he did on the land, its cultivation by him and the use he made of the land not susceptible of cultivation, would also seem sufficient. His occupancy was for plaintiff and continued from 1904 to the commencement of the action in 1910. He testified that after defendant left the county he understood that the land belonged to the Madden estate. "Q. When was the first time you understood it belonged to Madden? A. About the time I went to work for Mr. Madden about fifteen years ago—1896 I think it was. Q. They claimed the land at that time? A. I think they did; I understood it that way. Q. They were claiming it by reason of that execution sale that took place in 1903? A. I understood that Mr. Madden claimed it before that." He testified that when he fenced the land there was an eighty-acre tract of government land adjoining the land claimed by plaintiff; that he, Campbell, made claim to it and in building the fence he built around the entire tract, making no division fence between the two tracts. He testified that he filed on this eighty acres about the time this action was brought; that others claimed it and he didn't know whether he would get it. On the east he said he included about twenty acres of

21 Cal. App.—35

government land which he thought he might use for pasture but he made no claim to it. He also testified that from 1904 until the commencement of the action he had the exclusive possession of the land; that from the time he fenced it his possession had not been interrupted and that his possession was peaceable and continuous.

Witness Cantrall testified that he had known the land for about twenty years; that Campbell fenced it in 1904 and had cultivated part of the land ever since; that the fence erected by Campbell was a good cattle fence. Asked who claimed to own the land he answered: "I have always understood it was Mrs. Madden's and until Mr. Campbell came I always heard it was. I knew years ago it belonged to Mr. Hall. Q. When was the first time you knew Mrs. Madden claimed it? A. Well, when I first went there, I supposed Mr. Madden claimed it; and then when Mr. Madden left there was a sale or something, and she bought the land in, and I heard it was hers." (The only sale at which she bought the land was the sheriff's sale, 1903, which was set aside and the certificate canceled.) "Q. First Mr. Madden claimed the land? A. Yes, sir, I heard that; he never told me. I understood it belonged to him." He also testified that he "heard that Mr. Madden got a tax title to it, or something like that." (No tax title was shown.)

Witness Mattes testified that he had known plaintiff for twelve years; that he had never seen her on the land in question; that Mrs. Madden "had claimed it for about eight years"; never heard that "anybody else claimed it until this trouble came up"; that she never told him what right she had.

Witness Dorris testified that he had known plaintiff for twenty years; knew the defendant and that he left Modoc County in the year 1892 and had not been back, to witness's knowledge, "until last year," since then. He testified to Campbell's fencing and cultivating the land much the same as other witnesses. He was asked how long Mrs. Madden had claimed the land. "A. I don't know how long she has claimed it; a long time. Mr. Madden claimed it directly after Mr. Hall left. I understood that it has always been claimed since then by the Madden family. Q. Mr. Madden claimed it in the first place, and after he left Mrs. Madden claimed it? A. Yes, sir." On cross-examination he was asked how he

knew that Campbell built the fence.  "A. I don't know; he said that was what he was going to do.  He started in to fence the other piece and found out it was vacant and filed on it; after he started in with the fence he filed on the vacant land as a homestead below her place.  He started to fence it all right, and found there was vacant land, and said he believed he would take it up.  Q. And you knew that the land belonged to Mr. Hall, did you, before he left?  A. I know he claimed a piece out there where he had his cabin and garden.  Q. And after Mr. Hall went away Mr. Madden claimed it?  A. Yes, sir.  Q. When did Mrs. Madden first claim it?  A. I don't know as Mrs. Madden ever claimed it in particular to me.  She talked about the place and Mr. Campbell fencing it; she claimed it then; and it has always been claimed by the Madden family. . . . She never told me how she founded her claim."

The foregoing is the substance of the evidence.

It is contended that the findings are not supported by the evidence and that there is a failure to find upon a material issue.  Upon the second objection the criticism is that the finding is that plaintiff entered "under claim of title" and there is no finding that she entered under "claim of right."  Considering all the findings, we think they were sufficient if supported by the evidence.

Briefly, the facts present this situation: In 1892 defendant owned the land as patentee; being about to move away he placed it in charge of plaintiff's husband whose possession thenceforward must be treated as permissive and as so continuing until by some act on his part renouncing his agency and assumption of right in himself hostile to his principal, the defendant, and brought home to him.  There is evidence that his neighbors understood that Madden claimed the land or that it belonged to the Madden family, but there is no evidence of his having acquired any right to the land by prescription, purchase or otherwise or to its possession except a permissive right.  The first hostile act shown, and that was not by Madden, occurred in 1903 when a judgment was obtained against Madden in an action, the nature of which is not explained, this land with other property was levied upon and sold as Madden's property, and bought by plaintiff, but the sale was set aside.  She employed Campbell to take pos-

session in the spring of 1904, having no color of title, and her possession, such as it was, was initiated and continued by Campbell for her. She was then the wife of Madden and there is no evidence that she ceased to be his wife. She held his unrevoked power of attorney and was acting for him as his representative in respect of this and other land. Some of the witnesses spoke of her claiming the land after Madden "left," but he was her husband, according to her own showing, in 1903, and the presumption is that he so continued to be. His possession was her possession up to that time. Whether, without title or color of title in her, she could initiate an adverse claim in her own right while his wife, is one of the questions in the case.

The second question is, Did the fence built by Campbell meet the requirements of the law? He fenced, in one inclosure, the land in question and government land to which he made claim and still other government land to which he made no claim. Concededly, this fence did not mark the lines of the land in question, nor did it indicate necessarily the land claimed by plaintiff.

We have found cases holding that, where the title has been conveyed to the wife and the possession by the husband and wife is open under such deed, the possession enures to the benefit of the wife and she cannot be deprived of the benefits of the statute, nor is she required to live separate and apart from her husband. *Ramsey* v. *Quillen*, 5 Lea (73 Tenn.), 184, is such a case. (See *Veal* v. *Robinson*, 70 Ga. 809.) In *Steel* v. *Johnson*, 4 Allen (Mass.), 425, the husband was permitted to avail himself of the prescriptive title of his wife which the court held had vested in her. In *Collins* v. *Lynch*, 157 Pa. St. 246, 37 Am. St. Rep. 723, [27 Atl. 721], the wife took possession under deed from her father and her adverse possession was held to have vested title in her which was not affected by declarations of her husband. *Clark* v. *Gilbert*, 39 Conn. 94, was the case of a parol gift to the wife under which she and her husband went into possession and occupied the land uninterruptedly, adversely, and exclusively as her own for fifteen years. It was held that the wife thereby acquired a complete title in herself. (See also *Jackson* v. *French*, 3 Wend. (N. Y.) 337, [20 Am. Dec. 699].)

In the case of *Warr* v. *Honeck,* 8 Utah, 61, [29 Pac. 1119], defendant and her husband were living separate and apart under an invalid decree of divorce by which she had been awarded the W. ½ of a quarter section of land owned by her husband when the decree was entered. She occupied the land thereafter with her family under circumstances such as constituted adverse possession. Her husband conveyed this land to plaintiff who had notice of the facts. Holding that a wife living apart from her husband could hold property adversely to him, the court said: "All the cases, so far as I have been able to examine them, cited by counsel for appellant in support of the proposition that a wife cannot hold property adversely to her husband, are where the husband and wife are living together, and therefore, have no application to this case." The court further said: "The oneness constituted by the marriage relation at common law doubtless is based upon the statement of the Christ, 'For this cause a man will leave his father and his mother and cleave unto his wife, and they twain become one flesh.' But the condition is that he cleave unto her, so that when he ceases to cleave unto her—separates from her—and leaves her to take care of herself and their children, this oneness ceases, and they no longer are one flesh, but are twain, and this the common law recognizes." (Citing cases.)

In *First Nat. Bank* v. *Guerra,* 61 Cal. 109, 113, Francesca Guerra was the owner of the land as tenant in common with Antonio Guerra. In 1861 his wife filed a homestead on the same which was invalid. In 1876 Francesca mortgaged his interest in the land which was foreclosed and title finally came to plaintiff. Mrs. Guerra claimed and the lower court found that she had acquired title by adverse possession. Said the court: "But it is evident that this last finding cannot avail her. It was by virtue of her marital relations with her husband that she filed the declaration of homestead in 1861, and has continued to claim the premises as a homestead. There is no pretense that her husband claimed adversely to any one, and she could not claim adversely to him or to those holding under him so long as he remained the head of the family, which he did until his death, subsequent to July 18, 1876."

As between husband and wife adverse possession cannot exist during coverture, and the marital relations must have been terminated either by divorce or abandonment, in order that one may acquire title from the other by adverse possession. (1 Am. & Eng. Ency. of Law, p. 820.) At common law "the possession of the wife is the possession of the husband because her legal existence is merged in his, and the wife is positively incapable of a possession, in the eye of the law, distinct from that of her husband." (*Bell* v. *Bell's Admrs.,* 37 Ala. 536, [79 Am. Dec. 73].) The court in that case recognized an exception to the rule, enforced in equity, where the wife is in possession of property, claiming openly that it was conveyed to her as a separate estate and she had been in possession for more than twenty years, the law would presume against her husband that the claim was founded on a valid conveyance creating a separate estate.

In *Hendricks* v. *Rasson,* 53 Mich. 575, [19 N. W. 192], it was held that a husband cannot hold adversely to his wife premises of which they are in joint occupancy as a family.

In the case of *Frink* v. *Alsip,* 49 Cal. 103, it was decided that where the husband rents land from the owner and moves on to it with his family, in subordination to the owner's title, the wife cannot, for herself, being a *feme covert,* and during coverture, claim the premises adversely to the owner, so as to set the statute in motion.

So far as appears from the evidence in this case, Mrs. Madden sought to acquire a title to the land as her separate estate by her own possession, through a tenant, Campbell, and while she was the wife of John Madden, and entirely independent of her husband. The agency or permission or tenancy under which Madden came into possession was never disavowed or repudiated by him nor was any claim or notice of title in hostility to defendant's title ever brought home to defendant by Madden. If Madden be treated as the agent of defendant his possession was that of his principal "and cannot become adverse to him until a disclaimer of his title and the assertion of a hostile title be brought home to his knowledge." (1 Am. & Eng. Ency. of Law, p. 815.) If he is to be regarded as a tenant "his possession is consistent with the title of the landlord and cannot, therefore, be adverse to him." (Id., p. 810.) If Madden's possession was merely permissive,

it could never ripen into title by adverse possession (Id., p. 794), and the possession of a caretaker of the land is permissive. (*Heward* v. *O'Donohoe,* 19 Can. Supreme Ct. 341.) Permission is presumed to continue after having once been given. (*Hall* v. *Stevens,* 9 Met. (Mass.) 418.)

We do not think a married woman not living separate and apart from her husband and having no claim in her own right to land can acquire title to it as her separate estate by adverse possession.

Campbell was employed as plaintiff's agent to take possession of the land and fence it and to so use it as to give notice to the world of her adverse claim. He fenced, in the one inclosure, more government land that he inclosed as hers—part of which government land he claimed and part he made no claim to. We doubt whether such an inclosure was sufficient as evidence of an adverse claim by plaintiff to the specific parcel of land within such inclosure not otherwise identified. *Hamilton* v. *Flournoy,* 44 Or. 97, [74 Pac. 483], if rightly decided, would seem to strengthen our doubt.

*Hussey* v. *McDermott,* 23 Cal. 413, is cited by respondent. That was an action of forcible entry and detainer. The parties were owners of several tracts of land within an outside fence which formed a common inclosure for several farms; "but the division lines of the tract of each claimant were well known and defined." In *Packard* v. *Johnson,* 2 Cal. Unrep. 365, [4 Pac. 632], the evidence was that the adverse claimant fenced the disputed land with other of his own lands. *Reay* v. *Butler,* 95 Cal. 206, [30 Pac. 208], was an action in ejectment and the question was one of the right of possession. One Speck occupied and claimed a tract of about forty-one acres of the unoccupied pueblo lands of San Francisco. One Killian claimed an adjoining piece of about thirty-nine acres. They jointly built a fence around the exterior boundaries of the two tracts, but built no fence along the boundary line between the two tracts. It was held that the inclosure constituted possession as against any third party who is a mere intruder.

"A mere *intention* to occupy land, however openly proclaimed, is not possession. The intention must be carried into actual execution by such open, unequivoval and notorious *acts* of dominion, as plainly indicate to the public that the

person who performs them has appropriated the land and claims the exclusive dominion over it. Anything short of this is not what the law denominates actual possession.'' (*Brumagim* v. *Bradshaw,* 39 Cal. 24, 46.)

However it is not necessary to decide this question. As we hold that plaintiff had not legal capacity, under the circumstances shown, to acquire a prescriptive title in her own right, the findings are not supported and the judgment must be reversed.

It is so ordered.

Hart, J., and Burnett, J., concurred.