[Civ. No. 1431.   Third Appellate District.—December 2, 1915.]

## EMILY WILLS, Appellant, v. E. K. WOOD LUMBER & MILL COMPANY, Respondent.

QUIETING TITLE — FRAUDULENT CONVEYANCE — EVIDENCE — SUPPORT OF FINDING.—In this action to quiet title involving the validity of a deed of real property made by a husband to his wife, it is held that the evidence supports the findings that the husband, and not the wife, was the legal owner of the property at the time the deed thereof was made, and that such deed was void as to creditors of the husband because of lack of consideration and the insolvency of the grantor at the time of its execution.

ID.—BANKRUPTCY—JUDGMENT LIEN—WHEN ·PRESERVED.—The lien of a judgment as a preferential lien in favor of a creditor of a bankrupt is dissolved when the petition in bankruptcy is filed within four months of the obtaining of the judgment, but may be preserved for the benefit of all the creditors in a case where the dissolution of such lien would militate against the best interests of the estate of the bankrupt.

ID.—DISCHARGE IN BANKRUPTCY—LIENS NOT AFFECTED BY.—A discharge in bankruptcy releases from personal liability only, and has no effect upon liens against the property of the bankrupt.

ID.—FRAUDULENT CONVEYANCE—CONSTRUCTION OF SECTION 3442, CIVIL CODE—PROOF OF FRAUD—WHEN UNNECESSARY.—Section 3442 of the Civil Code makes a transfer fraudulent and void as to existing creditors, as a matter of law, when the transfer is voluntary or without a valuable consideration, by one while insolvent, or in contemplation of insolvency, and no proof of actual fraud is necessary.

ID.—ADVERSE POSSESSION—VOID DEED FROM HUSBAND TO WIFE.—The rule that a married woman not living separate and apart from her husband and having no claim in her own right to land cannot acquire title to it as her separate estate by adverse possession, is applicable to a case where the wife claims separate ownership under a void deed from the husband.

29 Cal. App.—7

APPEAL from a judgment of the Superior Court of Marin County, and from an order denying a new trial.   Edgar T. Zook, Judge.

The facts are stated in the opinion of the court.

Martin Stevens, for Appellant.

Martinelli & Greer, for Respondent.

CHIPMAN, P. J.—Plaintiff commenced the action to quiet her title to a certain lot situated in San Anselmo, Marin County, as against the claims which, it is alleged, defendant makes to the property.

Defendant answered, denying plaintiff's ownership and denying that defendant's claim to the property is without right.   Further answering, alleges: That defendant is the owner and entitled to possession of the property; that, on October 8, 1906, and long prior thereto, plaintiff and one Hamilton Wills were, and ever since have been and now are, husband and wife, and on said day said Hamilton Wills was the owner seized in fee and in possession of the whole of said real property; that on said day he was indebted to defendant in the sum of $4,432.72 for goods, wares, and merchandise theretofore sold and delivered by defendant to Hamilton Wills, and in addition to said indebtedness the said Hamilton Wills was also indebted to divers other persons in large sums of money, the amount of which defendant is unable to state; that on said date and for a long time prior thereto the said Hamilton Wills was unable to pay his debts in full from his own means as the same became due in the ordinary course of business, and was insolvent, all of which was well known to plaintiff; that on said day said Hamilton Wills, while so indebted and so insolvent, "and with full purpose and intent to hinder, delay, and defraud his creditors, and particularly this defendant, and designing to cheat his creditors and particularly this defendant, did voluntarily and without valuable consideration make, execute, and deliver to plaintiff a conveyance transferring to plaintiff all of said real property"; that on February 12, 1908, there was still due from said Hamilton Wills to defendant on account of said indebtedness of $4,432.72 a balance of $2,680.82, and that thereupon,

upon said last named day, defendant commenced an action against said Hamilton Wills, in the superior court of said county, to recover said balance; that on June 25, 1908, a judgment was duly given, made, and entered in said action in favor of defendant and against said Hamilton Wills for said balance, together with $15.50 costs of suit, which said judgment was duly docketed in the office of the county clerk of said county; that on the thirty-first day of October, 1910, a writ of execution was duly issued out of said court in said action directed to the sheriff of said county, who did, after due proceedings had, according to law, duly sell all of said premises to the defendant, and that a certificate of sale was duly issued by said sheriff to this defendant, and thereafter, on January 12, 1912, said sheriff duly executed and delivered to this defendant a deed conveying all of said property, which said deed was duly recorded on January 19, 1912, and ever since said twelfth day of January, 1912, this defendant has been and now is the owner of all said property and entitled to possession thereof.

The court found the facts substantially as alleged in the answer and, as conclusions of law, found that the transfer of said property by said Hamilton Wills to plaintiff, on October 8, 1906, "was fraudulent and void as to this defendant"; that plaintiff take nothing by her complaint and "that defendant is entitled to the judgment and decree of this court that it is the owner of and entitled to the possession of all of said real property," etc.

Judgment was accordingly entered for defendant, from which and from the order denying her motion for a new trial plaintiff appeals.

Plaintiff testified: "I am the owner of the property described in the complaint herein. I acquired said property in 1905 and went into possession thereof in September, 1905, and went to live upon the property at that time. At that time I had upon the property a little shack that cost about two hundred dollars. Ever since September, 1905, I have been living upon that property with my husband. Nobody but myself has been in possession of that property since September, 1905. I have paid all of the taxes which have been levied upon the property since September, 1905, and during all that time I have been in the exclusive possession of that property. I paid four hundred dollars for the lot." There

was received in evidence on the part of plaintiff a declaration of homestead by plaintiff, in due form, of date July 7, 1908, duly acknowledged and recorded on that day, "for the joint benefit for myself and husband." The value of the property was "estimated to be five thousand dollars."

On cross-examination she testified: "I acquired the property in June or July, 1905, from Mr. Croker. My husband bought the property from my money. My husband did business for me: I had about one thousand five hundred dollars at that time. I put my money in the First National Safe Deposit and the next time my husband bought a safe I put it in his safe, in a little tin box at San Francisco. . . . I came to California in 1888 or 1889. I came here in February and married Mr. Wills in the following November. I had over one thousand dollars when I married Mr. Wills. I do not know exactly how much over. I did not have any talk with Mr. Croker. (Mr. Croker conveyed the property to her husband.) I was very sick at the time. I earned money after I was married; I earn it still; I keep boarders. My husband went on the road. I kept boarders and raised chickens and made more money than he did. I loaned him money. In the sale and purchase of this property my husband was the agent for me on account of I was not acquainted with this language only a little. I was green to this country. Besides I was very sick. . . . Physically or mentally I was in no condition to transact business in 1905. My husband negotiated with and made the contract with Mr. Croker. Q. Do you know to whom Mr. Croker gave the deed to the property? A. Well, my husband done the business. I was in no condition to transact business. I don't know what they done. My husband took the money out of the safe deposit and paid cash for the property. He took it out of his safe. My husband kept the property in his name for quite a while and the papers were burned up; then I wanted the property recorded in my name; it belonged to me. . . . After the earthquake, when my husband went to the city, he said, 'The whole thing is destroyed,' safe and everything in his office, and after that he said, 'All my papers were destroyed.' He said, 'That is destroyed, too.' I said, 'You had better go to Mr. Croker and have a new deed and have it recorded who it belongs to, in my name.' . . . About this deed I said (to her husband) 'How can we settle it then?' we have no deed. I want to

have this property. I am well now and I want to have it, make it my home, so if anything, business or like such things, I could always make a living on it.' I think he went to Mr. Croker a couple of months after that when things were getting quiet.''

At this point in plaintiff's testimony defendant introduced a grant, bargain, and sale deed, dated October 6, 1906, made by Frederick Croker and his wife to Hamilton Wills, recorded on the same day. Also, deed of gift, dated October 8, 1906, from Hamilton Wills, to his wife (plaintiff), recorded on the same day. On further cross-examination, she testified: ''In 1905 a little shack was built on that lot. I bought it. My husband paid for it—the lumber. I gave him the bills. Not much lumber was bought from E. K. Wood Lumber & Mill Co. It only amounted to about three hundred dollars. My husband had the four hundred dollars to buy the lot in his safe. I told him to take it when I was in the hospital. I gave my husband all the money I had just for this property. I wanted to have a home. The doctors told me I must go into the country if I wanted to live; my husband was then a contractor building houses over in Marin County. I gave him that money to buy a home. . . . After I got out of the hospital, I came over to San Anselmo to live and the property was bought in June or July, 1905; when I first came to San Anselmo I was just camping; lying on a cot in a tent; in May, 1905, when I was in hospital, I said to my husband, 'Take all you need to get a home—buy a home,' and he took all of the money, I saved all my life for it; that money was over a thousand dollars.'' On re-examination she testified: ''Q. Was anything said by either of you as to whose name the property was to be taken in at that time? A. At that time I just say to my husband, 'Buy a property, buy a home.' At the time I just left everything to him as my agent, but I want to have it as my home. Q. You wanted him to buy a home for you with your money? A. Yes, sir, from my money. Q. Did he understand that from you? A. I guess he did. Q. Did you so tell him? A. Yes, sir.'' On recross she testified: ''My husband handed me the deed when he put the property in my name in 1906 and said, 'There is your property,' and I say, 'Now, for you to take the deed and put it in the safe deposit.' When he put it in my name he showed it to me and he went up to the city. I had no talk with him

about the deed at all; I was glad; I had my property; that is all; I saw my name in the deed. . . . When he showed it to me it had been recorded; I paid a dollar for recording it. . . . When he showed me the deed with my name, he came from San Rafael; it was already recorded; he showed it to me after it was recorded.''

Plaintiff rested at this point of the evidence. Concerning the execution of the deed to her husband, witness Croker, Wills' grantor, testified: ''I know Hamilton Wills; known him since 1905. I sold to Mr. Wills a lot in Ross Valley Park, lot 137, being the lot described in plaintiff's complaint, for four hundred dollars, terms cash; he made a deposit of half the cost and within thirty days, I think, paid the balance; am not sure, though; within the thirty days I made the deed transferring the property to him. The Court: Q. What did he say in reference to the purchase, if anything, to you? A. I don't remember. Q. Did he say he was purchasing it for anybody? A. No. Q. Other than himself? A. I think not.'' Here was introduced a receipt signed by Mr. Croker, dated June 21, 1905, acknowledging the receipt from Wills of two hundred dollars deposit on account of four hundred dollars, the purchase price of the property. Balance was to be paid in thirty days. He testified that he afterward made a deed to Wills. ''I made a second deed to him. (Above referred to of date October 6, 1906.) At the time I made this second deed to Hamilton Wills I do not know whether he asked me to execute the deed to his wife. I don't remember much about what was said by either of us at that time. I know he made some excuse for wanting the second deed. He did not at any time ask me to make a deed to his wife; he gave me some reason for wanting a second deed; it was satisfactory to me.'' Witness Studley, before whom the deed was acknowledged by Croker, testified that he knew of the deed formerly given Wills by Croker and asked Wills why he had not recorded it. ''I had been collecting taxes, but I noticed the property was still assessed to Mr. Croker and I asked him (Wills) why he hadn't recorded the deed. I do not remember his answer at all. Q. Did he at any time say to you the property was the property of his wife, Emily Wills? A. No, sir.''

Witness Pitcher, manager of defendant corporation, testified that he knew the land involved and that his company

"sold to Mr. Wills the materials for improvements or building on that land. He told me he bought the lot and wanted to build a house on it. That was in the fore part of 1905; that was the first business we did with him; to furnish material on this property in question. When we were furnishing lumber to him he put up one house at first; then I think he put up another house afterward, and the stable; he did not state to me that was his wife's property. Q. His statement to you was he had bought the property? A. He told me it was his property." This occurred before Wills conveyed the property to his wife and after Croker had conveyed it to him.

The foregoing is the evidence bearing upon the question of plaintiff's ownership of the land on October 8, 1906, the date of the deed of gift to her by her husband. The court found that, on that date, "Hamilton Wills was the owner, seized in fee, and in the possession of the whole of the real property mentioned in plaintiff's complaint." Mr. Wills was called as a witness by defendant and testified at some length, mainly concerning his condition as to solvency, which we shall have occasion to notice later. But he said nothing, and was asked no question by either party, as to what occurred when he made the purchase of the land in question.

The claim of plaintiff is that the property in question was purchased with her money and became her separate estate, though the deed originally was made to her husband, and that when he conveyed the property to her, on October 8, 1906, her title was unassailable by the then creditors of her husband.

The position of defendant is that, on October 8, 1906, her husband was insolvent, and that the conveyance made by him to his wife was voluntary and without consideration, and, under section 3442 of the Civil Code, was fraudulent and void as to existing creditors "and appellant has no right, title, interest or claim in or to said property."

It is not shown that defendant or any of the creditors of Wills knew that his wife claimed the property prior to October 8, 1906. Except as appears from her testimony, it was not shown that her husband understood that he was to make the purchase for her. His acts, unexplained, would seem to leave a strong inference that there was no such understanding. Without entering upon an analysis of plaintiff's testimony, we think the facts and circumstances thus far disclosed warranted the court in finding that, on October 8, 1906,

Hamilton Wills had the legal title unaffected, so far as his creditors were concerned, by any equity of his wife in the property.

The question we are next to determine is, Was Mr. Wills insolvent at that time and were the subsequent proceedings, as they appear in the record, sufficient to justify the finding that defendant, ever since the twelfth day of January, 1912, "has been, and now is, the owner of all said property." There was evidence that, on October 8, 1906, Wills was indebted to defendant in the sum of $4,432.72, on which some payments were afterward made, leaving due, in February, 1908, $2,680.82, for which defendant brought suit, and, on June 26, 1908, obtained judgment against Wills "which was never vacated, modified, or set aside or appealed from and duly became a final judgment in said action."

It appeared that, on October 16, 1906, Wills made an assignment to E. B. Martinelli of his interest in certain building contracts for the construction of two two-story residences in Ross Valley, "in trust to be applied by the said Martinelli to the payments of said amounts as may hereafter become due to any person, firm, or corporation on account of materials furnished or labor performed in completing said contracts. Any balance remaining of said moneys after full payment of all amounts which may hereafter become due after completing said contracts as aforesaid, shall be paid by said E. B. Martinelli *pro rata* to the following named persons who now have claims against the said contracts, to wit: E. K. Wood Lumber & Mill Company. Fox (electrician). Pearson (plasterer)." It appeared that this assignment was made because Wills was financially unable to purchase the necessary materials to complete the buildings; that, prior to October 8, 1906, he had been pressed by defendant for payment but was unable to respond; that he paid some installments and had reduced the debt, as above stated, when defendant brought suit against him. Wills was called as a witness by defendant, and testified that he was solvent at the above date; that he had one thousand dollars or one thousand two hundred dollars in bank and owned certain personal property the value of which he stated at about three hundred dollars, besides his interest in the said assigned contracts. His statement that he was solvent was disputed by uncontroverted evidence. He filed a voluntary petition in insolvency on July 10, 1908, on July 17,

1908, was adjudged an insolvent, and, on October 31, 1908, he was duly discharged in bankruptcy. In his petition he showed liabilities amounting to $4,241.02 and assets amounting to $3,416.35, of which $658 was claimed as exempt. Among the liabilities was stated $2,680 due defendant "1906–1907." On the schedule were the names of nineteen other creditors in various amounts, some of which were of date 1905 and 1906 and some in 1907. Witness Pitcher, manager of defendant corporation, testified that his company continued to do business with Wills after October 8, 1906, and "sold him roughly nine thousand dollars' worth of stuff, after October 8, 1906; the last date was February 12, 1909," and plaintiff contends that this is inconsistent with the claim that Wills was insolvent October 8, 1906. Pitcher testified that of the $4,432.72 due on that date Wills paid all but $2,680.82; "that was part of the indebtedness due to defendant on October 8, 1906; no part of that $2,680.82 has ever been paid to defendant," and this was the amount for which defendant obtained judgment, June 26, 1908, as stated above, and is the amount mentioned as due defendant in Wills' schedule of debts filed in the bankruptcy proceeding. There is no explanation as to the payments made on purchases from defendant after October 8, 1906. Presumably, they were met at the time as the claims accrued. It is urged as unlikely that defendant would continue doing business with Wills if defendant knew him to be insolvent and unable to pay debts then due defendant. It is not unusual for creditors to give extensions or make advances to debtors to tide them over conditions of financial stress, in the hope that they may find relief from their embarrassments. Indulgences of this character may continue over a considerable space of time but without favorable results, as appears to have been the case here. If Wills had paid his debts existing on October 8, 1906, and the liabilities which forced him into bankruptcy had arisen after the date named, there might be merit in the contention that he was not insolvent when he conveyed the property to his wife. But the evidence is that he was not then able to pay his debts out of his own means, nor was he so able at any later date. His insolvency existed on October 8, 1906, and continued to the date when he was declared an insolvent, his schedule of debts showing dates prior to 1906. The court found that on that day, and for a long time prior thereto,

Hamilton Wills was indebted to defendant in the amount stated, "and was also indebted to divers and other persons in large and sundry sums of money and that on said eighth day of October, 1906, Hamilton Wills was unable to pay his debts in full from his own means as the same became due in the ordinary course of business and was insolvent." We think there was evidence sufficient to support this finding.

It remains to notice by what means defendant obtained title to the land. Defendant's judgment was entered June 26, 1908, and Wills was adjudged a bankrupt on July 17, 1908. The judgment having been entered within four months prior to the filing of the petition in bankruptcy, it was dissolved by the adjudication of Wills' bankruptcy (subsec. c, sec. 67, Bankrupt Act); and the trustee of the estate of such bankrupt "shall be subrogated to and may enforce such right of such creditor for the benefit of the estate." (Bankrupt Act, sec. 67b.) The consent of E. K. Wood Lumber & Mill Company to such subrogation was duly filed. On June 6, 1910, by the trustee of the estate of Wills, a bankrupt, a petition was filed for an order that "the trustee be subrogated to the rights of the said E. K. Wood Lumber & Mill Company, and that the rights under said judgment pass to and be preserved for the benefit of the estate of the said bankrupt and for such other and further order as to this court may seem meet and proper." Section 67e, *supra,* further provides: "Or, if the dissolution of such lien would militate against the best interests of the estate of such person, the same shall not be dissolved but the trustee . . . shall be subrogated . . . and empowered to perfect and enforce the same . . . as such holder might have done had not bankruptcy proceedings intervened." In his petition the trustee alleged that Wills was the owner of the land in question on October 8, 1906; that on that day he conveyed the property to his wife without consideration; that he was then insolvent and that said transfer was made with intent to delay and defraud the creditors of said Hamilton Wills; set forth also the facts as to the indebtedness of Wills to E. K. Wood Lumber & Mill Co. and as to its obtaining judgment as hereinabove shown; that Emily Wills had executed a declaration of homestead on said property, as already shown; that Wills had filed his petition in bankruptcy and had been adjudicated a bankrupt, etc.

On June 6, 1910, Milton J. Green, referee in bankruptcy, made his order in which all the foregoing proceedings are recited as set forth in said petition of the trustee; also that said E. K. Wood Lumber & Mill Company had appeared in open court, and agreed with the trustee herein that said company ''should prosecute, in the name of said trustee and for the benefit of the estate of said bankrupt, an action to set aside the conveyance of October 8, 1906, hereinbefore referred to from said Hamilton Wills, Jr., said bankrupt, to Emily Wills, his wife, and . . . having further agreed in open court to indemnify the said trustee for all costs that might be incurred in the said action: It is hereby ordered:'' (then follows the order subrogating the trustee to all the rights of said company). ''It is further ordered that said E. K. Wood Lumber & Mill Company . . . be and they are hereby authorized to commence and prosecute such action and to pursue such legal remedies as they may deem proper in order to enforce the rights arising out of the judgment hereinbefore referred to, and to set aside and annul that certain conveyance made by the said bankrupt to Emily Wills, his wife, on the 8th day of October, 1906, . . '. and said E. K. Wood Lumber & Mill Company is hereby authorized to prosecute such action in the name of the trustee herein and for the benefit of the estate of said bankrupt.''

Section 67f of the Bankrupt Act provides as follows: ''That all levies, judgments, attachments or other liens obtained through legal proceedings against a person who is insolvent, at any time within four months prior to the filing of a petition in bankruptcy against him, shall be deemed null and void in case he is adjudged a bankrupt, and the property affected by the levy, judgment, attachment, or other lien shall be deemed wholly discharged and released from the same, and shall pass to the trustees as part of the estate of the bankrupt, unless the court shall, on due notice, order that the right under such levy, judgment, attachment, or other lien shall be preserved for the benefit of the estate; and thereupon the same may pass to and shall be preserved by the trustee for the benefit of the estate as aforesaid. . . .''

It will be recalled that the judgment was recovered June 25, 1908, by defendant against Wills, and, on July 8, 1908, plaintiff filed her declaration of homestead upon the property. On July 16, 1908, Wills filed his petition in bankruptcy and, on

the 17th, was adjudged a bankrupt.    The transfer by Wills to his wife being void as to creditors, defendant, but for the bankruptcy proceedings, would have been entitled to execution on its judgment and sale thereunder, notwithstanding the homestead declaration, for the latter was subject to the lien of the judgment.    (*First Nat. Bank of Los Angeles* v. *Maxwell,* 123 Cal. 360, 371, [69 Am. St. Rep. 64, 55 Pac. 980] ; *Bekins* v. *Dieterle,* 5 Cal. App. 690, 694, [91 Pac. 173].)    The bankruptcy proceedings rendered it impossible for defendant to avail itself of this right.    The trustee in bankruptcy became subrogated to defendant's rights, and had it not been for the saving clauses in the Bankrupt Act, the provision of section 67c, under which the lien was dissolved, would have given vitality to the declaration of homestead and the bankrupt would have had the right under the act to have his homestead exempted.    But here interposed the provision above quoted, that "if the dissolution of such lien would militate against the best interests of the estate of such person the same shall not be dissolved," etc.    The effect of the statute was to dissolve the judgment as a preferential lien in favor of the creditor but recognized the lien and preserved it for the benefit of all the creditors.    (*First Nat. Bank* v. *Staake,* 202 U. S. 141, [50 L. Ed. 96, 26 Sup. Ct. Rep. 580].)

It was under these provisions of the law that the proceedings above set forth were had, empowering defendant to act in the premises, and it thereupon, on October 31, 1910, caused execution to issue on its said judgment and the property to be sold by the sheriff.    On December 3, 1910, the sheriff issued his certificate of sale in due form, reciting that he had sold the property to said E. K. Wood Lumber & Mill Company and, on January 12, 1912, he duly executed and delivered his deed to said property as sheriff to said company in which the usual recitals in sheriff's deeds are set forth, and said deed was duly recorded on the 19th of January, 1912.

Appellant calls attention in her brief to the order of the bankrupt court, authorizing defendant to commence proceedings to annul the conveyance to plaintiff, and now claims that the authority given was to proceed in the name of the trustee and for the benefit of the bankrupt estate, whereas defendant proceeded in its own name for its own benefits and now holds the sheriff's deed in its own name.    There was no demurrer to the answer, and no objection was made to the

introduction of the proceedings in bankruptcy except the general objection of immateriality and irrelevancy. The order is susceptible of the construction that the authority was given to the defendant to proceed as it might deem best or to proceed in the name of the trustee. It is clear, however, that in either case the result should, if favorable, inure to the benefit of the bankrupt estate, and we must presume that the trustee will see to it that the estate gets the benefit.

.  Appellant is in error in assuming that the discharge of Wills from his liabilities had any effect upon the liens existing against his property. He is released from personal liability only. He has no concern with the property which passed to the trustee. Valid liens may be enforced after the bankrupt is discharged. (Loveland on Bankruptcy, 3d ed., sec. 385.)

Appellant is also in error in her contention that proof of actual fraud was necessary. Section 3442 of the Civil Code makes a transfer fraudulent and void as to existing creditors, as a matter of law, when the transfer is voluntary or without a valuable consideration, by one while insolvent, or in contemplation of insolvency. (*Cook* v. *Cockins,* 117 Cal. 140, 148, [48 Pac. 1025].)

The claim that the premises in question were always the homestead of plaintiff since 1905 is true only in the sense that they constituted her home. As a homestead in contemplation of the statute, free from the claims of her husband's creditors, it is not true. It was subject to the lien of defendant's judgment, as we have seen, and the lien thus created ripened into complete title adverse to plaintiff.

Error is assigned in permitting the defendant, over plaintiff's objection, to make plaintiff's husband a witness against her without her consent. The court allowed questions to be answered as to declarations and acts of Wills affecting the question of his solvency or insolvency on October 8, 1906. The court, however, finally, on motion to strike out all of Wills' testimony "as to declarations made subsequent to the execution and delivery of deed of gift of October 6, 1906, to his wife," said: "The Court: They will not be considered. I will simply make a general rule. I will not consider them in deciding the case. You cannot direct me to the particular things at this time. The motion will be granted if there are any declarations subsequent." We must assume that the court did as it promised to do. The insolvency of Wills was

shown irrespective of any testimony given by him which the ruling of the court excluded.

Plaintiff claims that she established title by prescription; that her possession after October 6, 1906, was adverse, open, and notorious under claim of separate ownership, and continued for more than five years prior to the commencement of this action, and that she paid all taxes which have been levied and assessed upon the premises. Defendant ignores this claim in its brief, and has not given the court any aid in solving the question. The undisputed evidence was that plaintiff and her husband were in possession of the lot in 1905 under the deed from Croker to Wills; that on October 8, 1906, Wills conveyed the lot to plaintiff and the deed was recorded on that day; that plaintiff and her husband have ever since had possession of the lot and plaintiff has paid all the taxes levied and assessed against the property since said date.

We held, in *Madden* v. *Hull,* 21 Cal. App. 541, [132 Pac. 291], that a married woman not living separate and apart from her husband and having no claim in her own right to land cannot acquire title to it as her separate estate by adverse possession. The deed to her by her husband we have held was null and void, and conveyed no title. She, therefore, had no claim in her own right and the rule just stated would seem to apply. If it should be said that her declaration of homestead imported color of title, five years had not elapsed from its date, July 8, 1908, before this action was commenced, to wit, September 23, 1912. It may be doubted, also, whether the adverse claim continued to run after the proceedings in bankruptcy were commenced and the subrogation of the trustee to the rights of the E. K. Wood Lumber & Mill Company in the judgment which was a lien on the property. These proceedings were had in 1910, under which the property was in that year sold to satisfy the judgment, and the sale culminated in the deed, the source of defendant's title.

We have thus endeavored to dispose of the somewhat complicated questions in the case so far as plaintiff has presented them in her brief. Our conclusion is that the evidence supports the findings and the findings support the judgment.

The judgment and order are therefore affirmed.

Burnett, J., and Hart, J., concurred.